Filed 5/24/22  Schoensiegel v. Abbott Laboratories Inc. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| CAITLIN SCHOENSIEGEL, | B312628, B314633 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV21537) |
| v. | |
| ABBOTT LABORATORIES INC. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Barbara Ann Meiers, Judge. Affirmed.

Aegis Law Firm, Samuel A. Wong and Ali S. Carlsen for Plaintiff and Appellant.

Seyfarth Shaw, Joshua A. Rodine and Sumithra R. Roberts for Defendants and Respondents.

————————————————

Plaintiff Caitlin Schoensiegel sued her former employer, defendant and respondent Abbott Laboratories, Inc. (Abbott), alleging eight violations of the Fair Employment and Housing Act, Government Code section 12900 et seq. (the FEHA), and the California Family Rights Act (CFRA), which is contained in the FEHA, in this employment discrimination action.[1] Schoensiegel also sued her supervisor, Kiyoko Robbins (Robbins), alleging harassment. Abbott terminated Schoensiegel after an investigation determined that she had breached Abbott's code of conduct by falsifying her sales calls log. Schoensiegel, who suffers from a rare bone disease, asserts that she was terminated because of her disability and that Abbott's explanation is pretextual.

Abbott and Robbins successfully moved the trial court for an order granting summary judgment, and Schoensiegel appeals from the judgment entered based on that order. Schoensiegel also appeals from an order awarding costs to Abbott and Robbins. We conclude that Abbott and Robbins met their burden of establishing that there is no triable issue of material fact as to any of Schoensiegel's causes of action.[2] We further conclude that Schoensiegel waived any argument that the trial court abused its discretion in awarding costs, and that the absence of written

---

[1] All further statutory references are to the Government Code unless otherwise stated.

[2] Schoensiegel does not address the trial court's summary adjudication of her denial of leave claim under the CFRA. We therefore consider that issue waived and do not address it further herein. (*Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1215.)

2

findings supporting the trial court's conclusion that Schoensiegel's action was frivolous does not require remand.

Accordingly, we affirm.

## BACKGROUND

### I. Schoensiegel's Medical Condition and Employment with Abbott

Years before joining Abbott, Schoensiegel was diagnosed with polyostotic fibrous dysplasia with McCune-Albright syndrome. Individuals with this genetic condition are born with the disease in certain bones and are subject to developing lesions in those bones that render the bones more likely to fracture.

Schoensiegel was hired by Abbott as a medical sales representative on June 5, 2017 by Vashti Major-Bliss (Major-Bliss), who was then the regional sales director. Abbott hired Robbins in July 2017, at which time she became Schoensiegel's manager.

Schoensiegel's position required her to call on target accounts, which were pediatric and obstetrician offices, in order to get the doctors to recommend Abbott's products. Representatives were also supposed to manage gratis, or samples, and distribute them to their accounts. A large part of Schoensiegel's job was ensuring that the sample cabinets at the account offices were stocked with Abbott products and organized. Additionally, "developing rapport with everyone in the office" was a "huge aspect of the position." Representatives were also required to be able to lift 25 pounds.

In September 2017, Schoensiegel received a document outlining the district expectations. As of September 2017, Schoensiegel was aware that Robbins expected her to: (1) achieve

"reach" and "frequency" goals[3] with respect to office calls; (2) achieve "reach" goals with respect to gratis; (3) submit expenses weekly; (4) communicate with Robbins on a weekly basis; (5) log calls into Salesforce.com (Salesforce)[4] after every call; (6) conduct an average of eight to 10 office calls each day; and (7) keep physicians' office hours, best times/days, and office call profiles up to date.

The district expectations also included an expectation that sales aids were to be used on every call. Sales aids were "visual aids" that representatives "could use as additional tools to aid in [their] sales," and included pamphlets, brochures, stickers, and iPad displays. Schoensiegel testified that sales aids could not be used over a phone call and that she did not call clients by telephone very often "[b]ecause it was expected that we try to go in person."

## II. Robbins Raises Issues with Schoensiegel's Performance

In October 2017, Robbins emailed Schoensiegel asking whether she was logging calls every day. Schoensiegel replied that it was an area that needed improvement and that it would not be a problem moving forward. In December 2017, Robbins sent an email to Schoensiegel because she had failed to submit an

---

[3] The "reach" goal refers to whether all offices assigned to the sales specialist were called on or sampled, and the "frequency" goal refers to how often offices were called.

[4] Salesforce is a customer relationship management system that allows representatives and managers to input customer account information, log and view sales calls, create and view strategic account plans, and manage orders of samples to offices.

expense report, after previously failing to submit expense reports for several months, which had resulted in late fees.

Schoensiegel first informed Robbins that she had a medical condition in December 2017 but did not state what the condition was or describe any of the symptoms to Robbins at that time. On December 21, 2017, Robbins contacted the hotline for Abbott's employee relations department (Employee Relations) because Schoensiegel had been "taking a lot of sick time," which she believed was affecting Schoensiegel's performance. Robbins ultimately spoke with Karen Punzalan (Punzalan), who provided her with a list of resources. These resources included (1) Major-Bliss, (2) Abbott's corporate policies and human resources website, (3) Matrix, Abbott's dedicated leave of absence hotline, and (4) Employee Relations.

In February 2018, Robbins sent Schoensiegel an email stating that Schoensiegel had submitted expense reports for the prior three weeks together, even though the reports were due on a weekly basis, and that this was unacceptable. Robbins asked if there was any reason why Schoensiegel could not meet that expectation, and Schoensiegel replied that she would not make any excuses and would "make the necessary expectations."

## III. Schoensiegel's Request for Accommodation

In March 2018, Schoensiegel emailed Robbins a letter from her doctor addressing her need for an SUV. The letter stated: "At this time I [*sic*] It is my medical opinion that Caitlin Schoensiegel requires a change in her company car as she has been advised to reduce her bending and lifting. [¶] We request that you provide her an SUV or cross over to minimize the amount of bending she must do to get her samples out of the trunk or back seat. This will decrease the amount of strain

around her upper extremities and rib cage area. Please process this request as it is medically necessary for Ms. Schoensiegel to decrease this strain." The letter did not contain a weight or lifting restriction, and Schoensiegel did not request one. Schoensiegel did not communicate any other restrictions imposed by her doctor to Abbott.

Robbins forwarded the request to her supervisor, Major-Bliss, the morning after receiving it. Schoensiegel received the requested SUV in May 2018. She did not request further accommodations while waiting for the SUV.

## IV. Robbins Reaches Out to Employee Relations Again

At a sales meeting that took place between April 30 and May 2, 2018, Schoensiegel informed Robbins for the first time that she had a "rare bone disease" and that she might need to lie down at the meeting. During a break, Schoensiegel laid down on the ground. Robbins stated, "Caitlin, are you going to get up off the floor and join us. This is ridiculous." When Schoensiegel asked whether she had done something wrong to upset Robbins, Robbins replied, "No, but if you need to go—if you need to go to the hotel room because of your medical condition you need to go to the hotel room. You can't be just laying [*sic*] on the floor during the meeting. It's extremely rude." Schoensiegel testified that everyone present had seen her lying on the ground but that she felt that Robbins had drawn attention to her condition.

Schoensiegel also disclosed to Robbins that she had taken half a pill of Norco, a prescription narcotic, at the sales meeting, which was why she needed to lie down. On May 1, 2018, Robbins opened another Employee Relations case concerning Schoensiegel's medical condition, stating that she believed that it negatively affected her job performance. Robbins spoke with

James Curcio, an Employee Relations manager, and informed him that Schoensiegel had disclosed a medical condition that impacted her ability to lift, laid on the floor during the sales meeting, and disclosed that she had taken a strong painkiller. Robbins also stated that Schoensiegel was frequently absent and that she believed that her performance was negatively impacted as a result.

The case was then transferred to Sharon Larson, who also spoke with Robbins. In their conversation, Robbins disclosed that she was not aware of any work restrictions from Schoensiegel's medical provider but that they had accommodated Schoensiegel by providing her with an SUV and that Schoensiegel was also having samples shipped directly to account offices. Larson explained Abbott's obligation to provide accommodations and advised Robbins to ask Schoensiegel what other assistance she may need to perform the essentials of her position. She explained that Schoensiegel should also discuss with her medical provider whether further restrictions were needed. Larson advised that Schoensiegel could utilize resources such as Matrix to discuss eligibility for leave if necessary. She also asked Robbins to remind Schoensiegel of Abbott's drug policy and provide her with a copy.

Following her conversation with Employee Relations, Robbins spoke with Schoensiegel and then sent an email summarizing their discussion. Robbins wrote that Schoensiegel could not be under the influence of any narcotic while performing the basic functions of her job, which included driving a vehicle between offices. Robbins also told Schoensiegel that if she experienced any health issues and needed additional resources, she could contact Matrix. She also informed Schoensiegel of

other resources that she could contact, including Major-Bliss, Abbott's human relations portal, an employee assistance program website and hotline, and Employee Relations.

Schoensiegel reached out to Employee Relations after the sales meeting but did not respond when an Employee Relations employee followed up with her, and the ticket was closed.

## V.  Robbins Places Additional Expectations on Schoensiegel to Manage Her Performance

As of May 2018, Schoensiegel had still not met the average of eight to 10 calls per day.  The month before, Robbins had told Schoensiegel that she wanted to have more communication with her, explaining that she spoke with other team members more than she spoke with Schoensiegel.  On May 7, 2018, Robbins asked Schoensiegel to begin scheduling formal weekly one-on-one meetings, in place of their previous informal weekly conversations.  Robbins also asked Schoensiegel to prepare an agenda for these calls and to email her a synopsis of their discussion after the call.  Additionally, Robbins asked Schoensiegel to begin preparing "three by three" reports, which entailed "looking at three accounts past and present and evaluating their changes and how you could go through and make more changes within the accounts."  Schoensiegel believed that she was the only one of her colleagues who was required to prepare this report but was not certain.  Robbins also expected Schoensiegel to hit 100 percent of her gratis reach within the first two weeks of the month.

Later that month, Robbins sent an email to Schoensiegel concerning her failure to timely complete her administrative work, as Schoensiegel had not submitted an expense report in two weeks.  On June 11, 2018, Robbins emailed Schoensiegel,

stating that she had waited 10 minutes for Schoensiegel to join their scheduled weekly call and that it was unacceptable that Schoensiegel continued to be late or miss calls. Schoensiegel replied that she was sick and was unable to make the call. Robbins replied that it was unacceptable that Schoensiegel had not informed her before the call was scheduled to begin that she was sick that day and stated that she would reschedule the call when Schoensiegel returned from sick time. Later that day, Robbins sent an email to her team thanking them for going over call and gratis reach that morning and that everyone, "except Caitlin who is out sick today," had informed Robbins that they would hit their call and gratis reach.

On June 17, 2018, Robbins sent Schoensiegel an email summarizing a conversation they had the prior week, in which Robbins had reiterated the expectation that Schoensiegel make eight to 10 calls a day. On June 22, 2018, Robbins emailed Schoensiegel to inform her that she had failed to meet her gratis reach goals for the month of May.

## VI.   Schoensiegel Reaches Out to Employee Relations

On June 27, 2018, Schoensiegel again reached out to Employee Relations and requested to speak to someone regarding Robbins. Employee Relations attempted to get in contact with Schoensiegel two days later but was unable to reach her by phone or to leave a message because her mailbox was full. Schoensiegel ultimately spoke with Employee Relations on July 16, 2018. The Employee Relations report documenting the call states that Schoensiegel felt that Robbins's temper had come out more following Schoensiegel's disclosure of her medical condition and that she felt that Robbins could be "pushing [her] out on leave [because] not performing as wanted." However, the report also

9

indicated that things were "back to normal" between them. Schoensiegel "[w]ant[ed] just to document" and would call back "[i]f things change for the worse."

In the meantime, Schoensiegel continued to receive emails concerning her performance. On July 11, 2018, Major-Bliss emailed Robbins, copying Schoensiegel, asking Robbins to work with Schoensiegel to submit timely expense reports, as Schoensiegel had not submitted an expense report since May 30, 2018. In August 2018, Robbins emailed Schoensiegel concerning her failure to log calls on the date that they were made and the fact that she had several days with only three or five calls logged. Schoensiegel agreed that she had failed to log calls by the end of the day on which they were made. Later that month, Robbins emailed Schoensiegel stating that Schoensiegel was not meeting her average calls per day and was repeatedly late to team calls. Robbins also attached the district expectations again and asked Schoensiegel to read them and confirm her understanding.

## VII. Schoensiegel Takes Medical Leave

On September 7, 2018, Schoensiegel went on CFRA leave. That same day, Robbins contacted Employee Relations to inquire about putting Schoensiegel on a Performance Improvement Plan (PIP). On September 10, 2018, Robbins received an email from Matrix asking for confirmation that Schoensiegel's first full day absent had been September 7. On September 12, 2018, Robbins spoke with Punzalan concerning Schoensiegel's performance. According to Punzalan's notes from the call, Robbins informed her that Schoensiegel was "consistently not meeting expectations not making calls, team calls." Robbins also reported that Schoensiegel was falsifying calls. The notes indicate that this allegation was based on the fact that Schoensiegel logged 16 calls

for July 31, when she was making only an average of 5.9 calls a day.  Though Schoensiegel did not claim that she saw all 16 offices on the date she logged the calls, Robbins considered this falsifying records because calls were supposed to be logged immediately after they were made.  Robbins was unable to pursue a PIP as a result of Schoensiegel's medical leave.

While Schoensiegel was out, Robbins divided 61 of her accounts among other representatives.  While in-person calls were required if samples were requested, Robbins testified that the representatives covering Schoensiegel's territory were permitted to make calls via telephone rather than call in person because they were still expected to make eight to 10 calls on their own accounts.

Additionally, while Schoensiegel was out, Robbins completed a job analysis worksheet for Matrix.  In the worksheet, Robbins described the essential functions of Schoensiegel's job as "Full-Time, 8 hour work days from 8–5 with some after hour/evenings required.  Deliver samples on occasion – loading/unloading car with sample boxes, entering call records in iPad, complete administrative work in timely fashion and balance all budgets for territory."

## VIII. Schoensiegel Returns to Work and Again Reaches Out to Employee Relations

Schoensiegel returned to work without restrictions on November 1, 2018, after receiving an extension of her leave, which originally ended on October 15.  Robbins spoke with Schoensiegel that day and sent an email summarizing their conversation.  Robbins wrote that she had reviewed the district expectations with Schoensiegel and attached them to her email.  They had also discussed hitting 100 percent call reach and gratis

11

reach during the first two weeks of each month and the need to enter calls into Salesforce after each call is made.

Robbins and Schoensiegel spoke again on November 5, and Robbins sent Schoensiegel another email summarizing their discussion. Robbins asked that Schoensiegel inform her in the future when her requests for leave were approved and of her expected return date. They again reviewed district expectations, and Robbins reiterated the expectation that Schoensiegel make an average of eight to 10 calls a day and log her calls in Salesforce after each call.

Robbins also scheduled a field ride-along with Schoensiegel for November 7, 2018. On November 5, Schoensiegel reached out to Employee Relations and asked whether there was any rule concerning the time frame in which she would be required to have a ride-along with Robbins following a leave. Schoensiegel spoke with Curcio, who advised her that there was no specific rule, and indicated that Schoensiegel should discuss her concerns with Robbins. Schoensiegel also informed him that she was concerned that Robbins had a pattern of being overly strict with employees when she wanted to get rid of them. Curcio subsequently investigated these claims and found that the employees who Schoensiegel had cited as leaving the company were both male and female and of various ages. Some of these employees had raised concerns about how demanding Robbins can be, and Curcio's report stated that "[i]t is recognized [Robbins] can be a very demanding and direct manager but n [*sic*] evidence that she is discriminating against any specific group." Curcio did not find Schoensiegel's claim that Robbins was trying to get rid of her to staff the team only with people that Robbins had hired to be substantiated.

## IX. Robbins Reviews Schoensiegel's Call Log and Sees That She Has Been Calling a Closed Office

On November 7, 2018, Robbins joined Schoensiegel on her calls and completed a territory assessment evaluating Schoensiegel's performance. In the assessment, Robbins stated that she reviewed Schoensiegel's call log from the previous day and saw that Schoensiegel had been logging calls on Beverly Hills Group of Women's Physicians (BHGWP), the office of Robbins's personal obstetrician, which had been closed since February 2018. The assessment indicates that Robbins told Schoensiegel that the definition of a call is "physically going to an office and educating the physicians and the staff on the clinical benefits of our products" and that "logging a call on an office that is no longer in business is falsifying a call." Schoensiegel testified that she had told Robbins, "We're still supposed to call on [closed offices] because they are still showing up on our reports as red so they still have to be called on, but you document that it's closed." Robbins replied that she had never instructed Schoensiegel to call on closed offices and that she was not supposed to be calling on them.

According to a report that Schoensiegel submitted on June 14, 2018, she had last provided samples to BHGWP on April 30, 2018, around a month after the office closed.[5]

---

[5] Schoensiegel's contention that this fact is disputed is not well taken. Although the report itself is not in the record, Schoensiegel's testimony is clear that she had forwarded a report to Robbins on June 14, 2018, that she was the person who filled out the information concerning sampling that went in the report, and that the report showed that BHGWP was last provided samples on April 30, 2018.

**X.    Employee Relations Opens an Investigation Resulting in Schoensiegel's Termination**

On November 8, 2018, Robbins reached out to Punzalan regarding Schoensiegel's call records, and Punzalan began an investigation. Punzalan requested and reviewed Schoensiegel's account records, call records and logs in Salesforce, all departmental expectations, and relevant emails between Robbins and Schoensiegel. Punzalan also interviewed both Robbins and Schoensiegel. During her call with Punzalan, Schoensiegel acknowledged that the BHGWP office had been closed as early as February 2018 and that she had documented the office as closed in her logs. After speaking with Punzalan, Schoensiegel also sent an email with additional points she wished to raise. In the email, Schoensiegel asserted that because representatives are specifically instructed to call offices when covering another representative's accounts, a phone call "definitely counts as a sales call."

Punzalan concluded that because Schoensiegel had logged calls on BHGWP for at least eight months after she had reported that the office was closed, and because Schoensiegel's major performance issue was a failure to maintain an average of eight to 10 calls a day, Schoensiegel's claims about being permitted to log calls on closed offices were neither plausible nor credible. Punzalan determined that Schoensiegel had violated Abbott's code of conduct, which provides that all books, records, and accounts must accurately reflect the nature of the transactions recorded and that no false or artificial entries shall be made for any purpose. On December 11, 2018, Punzalan prepared a worksheet that summarized her investigation and recommended Schoensiegel's termination. On December 12, Kevin Mason,

Abbott's business human resources director, emailed Major-Bliss and Robbins stating that he and Jerry Hutchinson, vice president of business human resources, had approved the termination recommendation. That same day, Schoensiegel requested medical leave from December 13, 2018 through February 28, 2019, which was granted.

On December 13, 2018, Schoensiegel informed Robbins that she was going out on leave. Because they had received all approvals to terminate Schoensiegel before she filed the claim for leave, Punzalan informed Robbins that they could proceed with Schoensiegel's termination.

## XI.    Procedural History

Schoensiegel brought her action against Abbott and Robbins in June 2019. In her operative complaint, Schoensiegel alleged eight causes of action: (1) unlawful discrimination based on disability in violation of the FEHA; (2) failure to provide a reasonable accommodation in violation of the FEHA; (3) failure to engage in the interactive process in violation of the FEHA; (4) retaliation in violation of the FEHA; (5) retaliation in violation of the CFRA; (6) harassment in violation of the FEHA; (7) failure to prevent discrimination, harassment, and retaliation and wrongful termination in violation of public policy; and (8) denial of CFRA leave.

In December 2020, Abbott and Robbins moved for summary judgment. Following oral argument, the trial court granted defendants' motion. With respect to Schoensiegel's discrimination claim, the trial court found that Schoensiegel had failed to meet her prima facie burden of showing that she was a "qualified individual" because she was unable "to do her job in keeping with the same level of performance expected of her

15

counterparts." The trial court focused on Schoensiegel's failure to achieve an average of eight to 10 sales calls a day, finding that "[n]ot only were these in-person visits an essential part of the job, they in essence were the job." The court rejected that Schoensiegel could have performed the essential functions of her job with a reasonable accommodation because the undisputed record showed that she had received every accommodation she requested. The trial court further held that the record was clear that Abbott's reason for terminating Schoensiegel was not her disability but her falsification of records, and that no facts presented supported her claim of pretext.

The trial court also concluded that no evidence supported Schoensiegel's remaining claims.

In March 2021, defendants filed their memorandum of costs, seeking $20,767.73, which Schoensiegel moved to tax in April 2021. The court granted the motion in part and denied it in part, ruling that $3,493.50 should be deducted, resulting in a cost award of $17,274.23. The trial court's minute order noted that the court had "found and determined that this lawsuit was frivolously filed and pursued."

## DISCUSSION

I. **Summary Judgment Was Properly Granted on All Schoensiegel's Discrimination Causes of Action**

A. **Standard of review**

We review an order granting summary judgment de novo, "considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).)

A defendant moving for summary judgment must show "that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action." (Code Civ. Proc., § 437c, subd. (p)(2).) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally construing her evidentiary submission while strictly scrutinizing defendants' own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

Summary judgment is appropriate only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A triable issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 856.)

In the employment discrimination context, an employee's evidence submitted in opposition to an employer's motion for summary judgment is construed liberally, yet "remains subject to careful scrutiny." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433.) The employee's "subjective beliefs . . . do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations." (*Ibid.*)

## B. Abbott was entitled to judgment as a matter of law on Schoensiegel's disability claim

The FEHA provides, in relevant part, that "[i]t is an unlawful employment practice . . . [¶] . . . [f]or an employer, because of the . . . physical disability [or] medical condition . . . of

17

any person, to refuse to hire or employ the person . . . or to bar or to discharge the person from employment . . . ." (§ 12940, subd. (a).) To establish a prima facie case for disparate treatment discrimination, plaintiff must show (1) she suffers from a disability, (2) she is otherwise qualified to do her job, with or without accommodations, (3) she suffered an adverse employment action, and (4) the employer harbored discriminatory intent. (See *Guz, supra*, 24 Cal.4th at p. 355.)

If a prima facie case is established, the burden shifts to the defendant to produce evidence demonstrating the adverse action taken against the plaintiff was unrelated to his age or disability (i.e., a nondiscriminatory reason). When an employer does so, the burden shifts back to the plaintiff, who must demonstrate a triable issue by identifying evidence that reasonably suggests the adverse action is instead attributable to intentional discrimination. (*Guz, supra*, 24 Cal.4th at p. 357.)

The trial court concluded that there existed no dispute of material fact that Schoensiegel was not a qualified individual because she was not able to do her job with or without reasonable accommodations. The court also concluded that the record was clear that Abbott terminated Schoensiegel for reasons unrelated to her disability—namely, Schoensiegel's falsification of records— and that she presented no facts supporting a claim of pretext. We address these points in turn.

1. *Whether Schoensiegel was a "qualified individual"*

To prevail on summary adjudication of a disability discrimination claim, the employer must show there is no triable issue of material fact that the employee was unable to perform the essential functions of their position with or without accommodation. (*Zamora v. Security Industry Specialists, Inc.*

18

(2021) 71 Cal.App.5th 1, 43.) " 'Essential functions' means the fundamental job duties of the employment position the individual with a disability holds or desires." (§ 12926, subd. (f).) "Evidence of 'essential functions' may include the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the consequences of not requiring employees to perform the function, the terms of a collective bargaining agreement, the work experiences of past incumbents in the job, and the current work experience of incumbents in similar jobs." (*Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 717–718.) However, "[t]he duties listed in a job announcement are not conclusive—' "an employer may not turn every condition of employment which it elects to adopt into . . . an essential job function, merely by including it in a job description." ' " (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 977–978.)

In support of her assertion that the trial court erred, Schoensiegel argues that Abbott failed to put forth evidence of the essential functions of Schoensiegel's position. Abbott submitted the district expectations, various emails in which Robbins communicated her expectations to Schoensiegel, and Schoensiegel's testimony regarding what was expected of her. The undisputed evidence shows that Schoensiegel failed to achieve an average of eight to 10 calls a day and repeatedly failed to log calls and submit expense reports in a timely manner.

Schoensiegel argues, however, that achieving the eight to 10 calls a day listed in the district expectations was not itself an essential function. We consider this a closer question than the trial court did. The trial court found that "[n]ot only were these in-person visits an essential part of the job, they in essence were

19

the job.  To argue otherwise is like contending that a door-to-door vacuum salesperson need not go door-to-door and can just sit by the phone and explain to those at the other end how superior his or her product is and how it works and still be deemed to be 'doing the job' and 'performing the essentials.' "  However, there is no evidence that Schoensiegel was incapable of performing in-person calls, nor does Schoensiegel appear to argue that eliminating in-person visits was a reasonable accommodation that would have allowed her to perform the essential functions of her position.  Rather, the question is whether completing eight to 10 calls per day was an essential function of the job.  We have not seen, nor have the parties identified, a California case in which the determination of whether a disputed material fact exists with respect to plaintiff's status as a "qualified individual" rested on whether he or she could meet a specific performance metric, as opposed to the activity or function underlying that metric.

At least one federal court has found that a triable issue existed in a FEHA discrimination action where a plaintiff challenged whether meeting or exceeding performance benchmarks was an essential function of the job, even though " 'meet[ing] or exceed[ing]' " sales goals was part of the job description.  (*Smith v. BBVA Compass Bancshares, Inc.* (C.D. Cal., Mar. 31, 2021, No. EDCV191862JGBSHKx) [2021 WL 2497930 at pp. *10–11].)  The district court in *Smith* found that "while conducting sales may be an essential function, [the d]efendants fail[ed] to establish that 'meeting or exceeding' the sales goals at issue are essential to [the p]laintiff's position." (*Id.* at p. *11.)  Testimony from the CEO and supervisors established that the sales goals were " 'stretch goals' " and that 65 to 70 percent of employees did not meet their goals.  (*Id.* at p. *10.)

20

Here, Abbott has not introduced evidence concerning whether other employees consistently met the eight to 10 call average. Moreover, as Schoensiegel points out, a job analysis worksheet that Robbins was asked to complete in connection with Schoensiegel's leave describes the essential functions of Schoensiegel's job as "Full-Time, 8 hour work days from 8–5 with some after hour/evenings required. Deliver samples on occasion – loading/unloading car with sample boxes, entering call records in iPad, complete administrative work in timely fashion and balance all budgets for territory." The worksheet also identifies cognitive and physical tasks that were essential to Schoensiegel's position. It does not state that achieving the eight to 10 call average is an essential function. And while the district expectations are relevant evidence, they cannot be relied upon as conclusive proof that the "8-10 office calls each day/average" listed therein was an essential function. (Cf. *Lui v. City and County of San Francisco*, *supra*, 211 Cal.App.4th at pp. 977–978.)

Viewing the evidence in the light most favorable to the plaintiff, as we must, we conclude there is a triable issue as to whether completing an average of eight to 10 calls per day was an essential function of Schoensiegel's position.[6]

---

[6] Schoensiegel also contends that, even if achieving eight to 10 calls a day was an essential function, "Abbott ignores the multitude of accommodations that could have been provided that would have enabled Schoensiegel to perform that function." We need not reach the issue of whether unrequested accommodations may properly be considered in determining whether there is a triable issue of fact as to whether Schoensiegel could perform the essential functions of her position with or without

2. *Whether Abbott and Robbins have shown nondiscriminatory business reason for terminating Schoensiegel*

An employer may move for summary judgment against a discrimination cause of action with evidence of a legitimate, nondiscriminatory reason for the adverse employment action. (*Guz, supra*, 24 Cal.4th at p. 357.) A legitimate, nondiscriminatory reason is one that is unrelated to prohibited bias and that, if true, would preclude a finding of discrimination. (*Id.* at p. 358.) "While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with a motive to discriminate illegally." (*Ibid.*, italics omitted.) The employer's evidence must be sufficient to allow the trier of fact to conclude that it is more likely than not that one or more legitimate, nondiscriminatory reasons were the sole basis for the adverse employment action. (*Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1097–1098.)

By presenting such evidence, the employer shifts the burden to the plaintiff to present evidence that the employer's decision was motivated at least in part by prohibited discrimination.[7] (*Guz, supra*, 24 Cal.4th at pp. 353, 357.) The

accommodation, as we have concluded that there is a factual dispute as to the essential functions of Schoensiegel's position.

[7] This burden-shifting test is derived from the three-stage burden-shifting test established by the United States Supreme Court for use at trial in cases involving claims, such as those at issue here, of employment discrimination based on disparate treatment, known as the *McDonnell Douglas* test (*McDonnell*

plaintiff's evidence must be sufficient to support a reasonable inference that discrimination was a substantial motivating factor in the decision. (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232; *Guz*, at pp. 353, 357.) The stronger the employer's showing of a legitimate, nondiscriminatory reason, the stronger the plaintiff's evidence must be in order to create a reasonable inference of a discriminatory motive. (*Guz*, at p. 362 & fn. 25.)

The employee's evidence must relate to the motivation of the decision makers and prove, by nonspeculative evidence, "an actual causal link between prohibited motivation and termination." (*King v. United Parcel Service, Inc.*, *supra*, 152 Cal.App.4th at pp. 433–434.) To show that an employer's reason for termination is pretextual, an employee " 'cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.' " (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005.) "Rather it is incumbent upon the employee to produce 'substantial responsive evidence' demonstrating the existence of a material triable controversy as to pretext or discriminatory animus on the part of

---

*Douglas Corp. v. Green* (1973) 411 U.S. 792; *Guz*, *supra*, 24 Cal.4th at pp. 354, 357.) A plaintiff has the initial burden at trial to establish a prima facie case of employment discrimination. (*Guz*, at p. 354.) On a summary judgment motion, in contrast, a moving defendant has the initial burden to show that a cause of action has no merit (Code Civ. Proc., § 437c, subd. (p)(2)) and therefore has the initial burden to present evidence that its decision was motivated solely by legitimate, nondiscriminatory reasons. (*Kelly v. Stamps.com Inc.*, *supra*, 135 Cal.App.4th at pp. 1097–1098.)

the employer." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 862.) To meet this burden, the employee " 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," . . . and hence infer "that the employer did not act for . . . [the asserted] non-discriminatory reasons." ' " (*Hersant*, at p. 1005.)

Abbott has met its burden to produce evidence "that its action was taken for a legitimate, nondiscriminatory reason." (*Guz*, *supra*, 24 Cal.4th at pp. 355–356.) Schoensiegel was terminated for falsifying records because she continued to log calls on BHGWP after the office had closed. There is no material dispute that the BHGWP office closed in February 2018, that Schoensiegel logged calls on BHGWP until November 2018, and that she had reported having samples delivered there in April 2018, months after the office closed. After reviewing records, the expectations for sales representatives, and interviewing Robbins and Schoensiegel, Punzalan concluded that Schoensiegel's claimed reasons for continuing to log calls to BHGWP after it closed were implausible. This evidence satisfies Abbott's burden to make a " 'sufficient showing of a legitimate reason for discharge.' " (*Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 225.)

Thus, we focus our analysis primarily on whether Schoensiegel produced substantial responsive evidence creating a triable question of material fact regarding whether Abbott's cited reasons for terminating her were pretext. Having reviewed Schoensiegel's evidence and arguments, we conclude that a trier of fact could not reasonably conclude that Abbott's stated reasons

24

for terminating Schoensiegel were implausible, inconsistent, or baseless. Schoensiegel attempts to demonstrate falsity and pretext by arguing that Robbins was aware that Schoensiegel had been calling BHGWP for months because Schoensiegel had logged her calls in Salesforce. Although Schoensiegel asserts that "Robbins frequently ran reports and accessed [Schoensiegel's] [Salesforce] reports, so it is reasonable to assume that Robbins saw this activity well before September 2018," the only evidence on which Schoensiegel relies in making this claim is Robbins's testimony that she had the ability to go into any account and see the call history. Schoensiegel conceded that she had no evidence to show that Robbins had actually reviewed her call reports to see if she was calling on closed offices. According to Robbins's declaration and Punzalan's summary of her discussion with Robbins during her investigation, Robbins only learned of Schoensiegel's continued calls on BHGWP following the November 7, 2018 ride-along. Robbins then reviewed reports in Salesforce and saw that Schoensiegel had logged calls on BHGWP on a monthly basis after it had closed.

Schoensiegel also asserts that the reason for her termination was not believable because Robbins instructed Schoensiegel's colleagues to call on BHGWP while Schoensiegel was out on leave, even though she knew or should have known BHGWP had closed. However, Robbins's testimony and email show that Robbins took an Excel list of Schoensiegel's accounts, highlighted groups of 10 or so rows different colors, assigned the colors to Schoensiegel's colleagues, and asked them to call the accounts in their color group. BHGWP was one of the 61 accounts assigned to other sales representatives during Schoensiegel's leave. Robbins does not dispute that she knew

25

that BHGWP was closed at that time, but testified that highlighting BHGWP was an oversight, as she had "hundreds of lists" and was not looking at every name on those lists. Schoensiegel presents no evidence to support that this was anything more than an oversight.

Schoensiegel further claims that her termination in November 2018 was pretextual because Robbins and Punzalan had discussed her practice of calling on closed offices in September 2018 but chose not to terminate her at that time. Robbins testified that she believed Schoensiegel was falsifying records at that time because she logged 16 calls in one day. While Punzalan's testimony on the reason for falsification was unclear, Punzalan's notes state that Schoensiegel logged "16 calls in for 7/31" and she wrote "falsifying" immediately thereafter. Regardless of the basis for the allegation of falsification in September 2018, Punzalan testified that they "couldn't look into it further because [Schoensiegel] went out on a leave of absence." This is consistent with Robbins's testimony and the fact that Schoensiegel went on leave shortly thereafter. Thus, the undisputed evidence does not support an inference that Punzalan and Robbins decided to overlook the falsification and performance issues discussed in September; instead, it indicates that no action could be taken until Schoensiegel's medical leave ended.

Finally, Schoensiegel claims that her termination was pretextual because Abbott decided to terminate her only after she requested her second leave of absence. However, Punzalan recommended terminating Schoensiegel on December 11, the day *before* Schoensiegel requested medical leave. It is also uncontested that Schoensiegel informed Robbins that she was going out on leave for the first time on December 13. The

recommendation to terminate Schoensiegel was approved on December 12. Moreover, the timing of the decision alone is insufficient to create a material issue of disputed fact. "[A] disabled employee has no greater prerogative to compromise his integrity than any other employee," and the "mere fact that [the employer] found [the] plaintiff had breached its integrity policy shortly after returning to work is insufficient to raise an inference that [the employee's disability] prompted his discharge." (*King v. United Parcel Service, Inc.*, *supra*, 152 Cal.App.4th at p. 436.)

Without some evidence beyond mere conjecture connecting Abbott's decision to terminate Schoensiegel to her disability, Schoensiegel has failed to create a triable question of material fact that Abbott's reasoning was pretextual.

## C. Abbott was entitled to judgment as a matter of law on Schoensiegel's accommodation or good faith interactive process claims

The elements of a cause of action for failure to accommodate a disability under the FEHA are (1) the plaintiff has a disability under the FEHA or was regarded as having a disability, (2) the plaintiff is qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) the employer failed to reasonably accommodate the plaintiff's disability. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1009–1010.) Having determined above that a factual dispute exists as to the essential functions of Schoensiegel's position, we focus our analysis on the third element.

" 'Two principles underlie a cause of action for failure to provide a reasonable accommodation. First, the employee must

27

request an accommodation.  [Citation.]  Second, the parties must engage in an interactive process regarding the requested accommodation and, if the process fails, responsibility for the failure rests with the party who failed to participate in good faith.  [Citation.]'  [Citations.]"  (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1252.)  "Generally, ' "[t]he employee bears the burden of giving the employer notice of the disability.  [Citation.]  This notice then triggers the employer's burden to take 'positive steps' to accommodate the employee's limitations. . . .  [¶]  . . .  The employee, of course, retains a duty to cooperate with the employer's efforts by explaining [his or] her disability and qualifications.  [Citation.]  Reasonable accommodation thus envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the [employee's] capabilities and available positions."  [Citation.]'  [Citation.]"  (*Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1222.)

" ' " '[T]he employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it.' " ' "  (*Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1167.)  " ' "Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer," ' the employee bears the burden ' "to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." ' [Citation.]"  (*Doe v. Department of Corrections & Rehabilitation* (2019) 43 Cal.App.5th 721, 738–739, italics omitted.)

28

"While a claim of failure to accommodate [under section 12940, subdivision (m)] is independent of a cause of action for failure to engage in an interactive dialogue [under section 12940, subdivision (n)], each necessarily implicates the other." (*Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54.) "Although it is the employee's burden to initiate the process, no magic words are necessary, and the obligation arises once the employer becomes aware of the need to consider an accommodation. Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith." (*Id.* at p. 62, fn. 22.)

There is no dispute that Abbott accommodated Schoensiegel when she provided a note from her doctor requesting that she be given an SUV as her company car. However, Schoensiegel argues that, during the period she waited for the SUV, Robbins "refused to engage in any interactive process with [Schoensiegel] to determine whether other types accommodations could be made." However, Schoensiegel fails to identify any evidence showing that she attempted to discuss further accommodations during this period and was rebuffed. In fact, Schoensiegel agreed that the requests for vehicle accommodation, sick days, and leave were the only requests she made with regard to her medical condition, and that every request she made for time off from work relating to her medical condition was granted. Schoensiegel also testified that she did

29

not communicate any other restrictions given to her by her doctor to Abbott. " ' "It is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the earliest opportunity with a concise list of restrictions which must be met to accommodate the employee." ' [Citation.]" (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 349, italics omitted.) In the absence of any request from Schoensiegel for additional accommodation based on her restrictions—some of which she elected not to share—there is no evidence to support that Abbott failed to meet its duty to accommodate or to engage in an interactive process during this period.

Schoensiegel also argues that Robbins failed to engage in an interactive discussion in connection with the April and May 2018 sales meeting. However, it is undisputed that Robbins spoke to Schoensiegel following the sales meeting and emailed her a list of resources that included, but were not limited to, the Matrix absence hotline. Schoensiegel did not request any further accommodation other than leave, which, as noted, was granted.

Schoensiegel further contends that her request for leave in December 2018 was not accommodated. However, the record shows that Schoensiegel *was* approved for CFRA leave in December 2018, and there is no indication in the record that she would not have been allowed to take that leave but for the fact that Abbott had decided to terminate her. The purpose of a reasonable accommodation is to modify workplace conditions so that the employee may *continue* to perform the essential functions of the job held. (Cf. *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 975.) That purpose is nullified when the employer properly decides to terminate an

employee before an accommodation is requested. It would be unreasonable to subject Abbott to liability for failing to provide Schoensiegel with an accommodation after it decided to terminate her employment, merely because Schoensiegel requested the accommodation before she learned of the decision.

Summary judgment was therefore proper on Schoensiegel's failure to accommodate claim.

### D. Abbott was entitled to judgment as a matter of law on Schoensiegel's FEHA and CFRA retaliation claims

The FEHA makes it unlawful "[f]or any employer . . . to discharge . . . or otherwise discriminate against any person because the person has opposed any practices forbidden under this part . . . ." (§ 12940, subd. (h).) "[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042; see § 12940, subd. (h).) Similarly, the elements of a cause of action for retaliation in violation of the CFRA are: " '(1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA leave; (3) the plaintiff exercised her right to take leave for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment action, such as termination, fine, or suspension, because of her exercise of her right to CFRA leave.' " (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 885.)

"Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason

for the adverse employment action.  [Citation.]  If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation." (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1042; *Faust v. California Portland Cement Co.*, *supra*, 150 Cal.App.4th at p. 885.)

" ' " 'If the employer presents admissible evidence either that one or more of [the] plaintiff's prima facie elements is lacking, or that the adverse employment action was based on legitimate, nondiscriminatory factors, the employer will be entitled to summary judgment unless the plaintiff produces admissible evidence which raises a triable issue of fact material to the defendant's showing.' " ' " (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 309, italics omitted.)

It is undisputed that the first two elements of a prima facie FEHA retaliation case and the first three elements of a CFRA retaliation case are satisfied here.  Schoensiegel asserts that Abbott must negate the element requiring a causal connection between her termination and her requests for accommodation and leave, but fails to address any of the arguments Abbott made on summary judgment concerning a lack of causation.  Although Abbott bore the burden on summary judgment of showing that an element of the prima facie case was lacking, "[a]ppealed judgments and orders are presumed correct, and error must be affirmatively shown." (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502; see *Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 423 ["plaintiff bears the burden of establishing error on appeal, even though defendants had the burden of proving their right to summary judgment

32

before the trial court"].)  Even where our standard of review is de novo, failure to address an issue constitutes abandonment.  (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177 [affirming summary judgment with respect to certain claims where the appellant's briefs failed to challenge the independent grounds supporting the trial court's grant of summary adjudication on such claims].)  Schoensiegel has forfeited the contention that a prima facie case of retaliation exists by failing to make any meaningful argument regarding causation in her opening brief.

Schoensiegel further asserts that "because [she] presented sufficient evidence of pretext, the [t]rial [c]ourt's order should be granted as to [Schoensiegel's] causes of action for retaliation."  However, as discussed above in connection with Schoensiegel's discrimination claim, Abbott identified a legitimate, non-retaliatory basis for Schoensiegel's termination.  The burden therefore shifts back to Schoensiegel, who has failed to identify substantial evidence that would permit a jury to find she was fired in retaliation for her requests for accommodation or leave.  Schoensiegel's retaliation claims therefore fail as a matter of law.

E.     **Abbott and Robbins were entitled to judgment as a matter of law on Schoensiegel's disability harassment claim**

The FEHA prohibits an employer from harassing an employee "because of . . . physical disability."  (§ 12940, subd. (j)(1).)  A supervisor may also be subject to personal liability for harassment.  (§ 12940, subd. (j)(3).)  Schoensiegel brings a harassment claim against both Abbott and Robbins.  A "claim of disability harassment requires a showing ' "that the conduct complained of was severe enough or sufficiently

33

pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their [disability].' ' [Citation.] . . . Since 'there is no possible justification for harassment in the workplace,' an employer cannot offer a legitimate nondiscriminatory reason for it." (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 927.)

"Actionable harassment consists of more than 'annoying or "merely offensive" comments in the workplace,' and it cannot be 'occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature.' [Citation.]" (*Cornell v. Berkeley Tennis Club, supra*, 18 Cal.App.5th at p. 940.) "[H]arassment consists of conduct outside the scope of necessary job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives. Harassment is not conduct of a type necessary for management of the employer's business or performance of the supervisory employee's job." (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 63.) "[T]he Legislature intended that commonly necessary personnel management actions such as hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or nonassignment of supervisory functions, deciding who will and who will not attend meetings, deciding who will be laid off, and the like, do not come within the meaning of harassment." (*Id.* at pp. 64–65.)

"Whether the harassment is sufficiently severe or pervasive to create a hostile work environment 'must be assessed from the

34

"perspective of a reasonable person belonging to [the same protected class as] the plaintiff." ' [Citation.]  In making this assessment, we consider several factors, including ' "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' [Citation.]" (*Cornell v. Berkeley Tennis Club, supra*, 18 Cal.App.5th at p. 940.)

Schoensiegel lists several actions taken by Robbins that she asserts constitute harassment.  For example, Schoensiegel asserts that Robbins "rated [Schoensiegel] lower on her annual review in an area where [Schoensiegel] had actually met the expectations," but fails to direct the court to the relevant evidence.  Abbott argues that the 2017 annual review at issue preceded Schoensiegel's disclosure of her disability and thus cannot support a claim of harassment.  We agree.  Although Schoensiegel disclosed that she had a "medical condition" in December 2017, she did not communicate any of her symptoms or the nature of the condition.  " ' "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the [FEHA]." ' " (*Avila v. Continental Airlines, Inc., supra*, 165 Cal.App.4th at p. 1248.) Thus, any claim that Schoensiegel was harassed because of her disability in December 2017 is baseless as a matter of law.

Schoensiegel further relies on the fact that, in May 2018, shortly after Robbins had reached out to Employee Relations concerning Schoensiegel's condition, Robbins gave Schoensiegel additional responsibilities, including scheduling a weekly one-on-one call between them, preparing an agenda and summary, and generating a "three by three report."  Although we accept

Schoensiegel's characterization of this evidence—that Robbins was "micromanaging" Schoensiegel by imposing these requirements—the "job or project assignments" described were nevertheless "of a type necessary for management of the employer's business or performance of the supervisory employee's job" that do not amount to actionable harassment. (*Janken v. GM Hughes Electronics*, *supra*, 46 Cal.App.4th at pp. 63–65.) Schoensiegel admitted that a possible explanation for the additional requirements imposed on her included that Robbins was required to manage her performance because she was missing her metrics. It is undisputed that, beginning in October 2017, Schoensiegel was unable to meet expectations in several areas, including meeting goals for her average number of calls, logging calls immediately after making them, and submitting expense reports on a weekly basis. It is also uncontested that Robbins told Schoensiegel in April 2018 that she spoke more frequently with Schoensiegel's colleagues than with Schoensiegel and that she wanted to have more communication with Schoensiegel. It is undisputed that Robbins informed Schoensiegel she had requested formal weekly calls to help Schoensiegel succeed. With respect to the additional "three by three" report, Schoensiegel testified that she believed Robbins requested these reports "for me to see identifiable ways to improve or how I have improved."

Although "some official employment actions done in furtherance of a supervisor's managerial role can also have a secondary effect of communicating a hostile message," such actions must "establish a widespread pattern of bias." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 709.) While the evidence supports that Robbins was "a very demanding and direct

manager," there is no evidence of a pattern of bias in Robbins's exercise of her supervisory role. Schoensiegel does not provide any evidence that she was the only sales representative subject to the expectations imposed in May 2018. Moreover, in the course of investigating Schoensiegel's concerns about Robbins, James Curcio found that several former employees had stated that Robbins was "strict and demanding" and could be "harsh." There is no indication in the record that all of these former employees belonged to any specific protected group.

Schoensiegel also relies on three comments made by Robbins in support of her harassment claim. First, Schoensiegel testified that when she was lying on the floor at the sales meeting in late April/early May 2018, Robbins stated "[t]his is ridiculous" and told Schoensiegel, "if you need to go to the hotel room because of your medical condition you need to go to the hotel room. You can't be just laying [*sic*] on the floor during the meeting. It's extremely rude." Second, in a June 2018 email, Robbins thanked her team for joining a call and stated that "All of you, except Caitlin who is out sick today, have shared with me that you will hit your call reach, gratis reach, and complete your pediasure inservices by Friday." Third, Schoensiegel claims that Robbins "berated" Schoensiegel for missing a call due to her disability and called it "unacceptable." Schoensiegel fails to direct the court to the portion of the record in which this final comment was made. When viewed in context, the relevant emails show that, after waiting 10 minutes for Schoensiegel to join a call, Robbins sent her an email stating that it was "unacceptable that you continue to be late or miss our calls." Schoensiegel then informed Robbins that she was sick and would not be joining the call. Robbins responded that this was

unacceptable and that Schoensiegel should have notified Robbins that she was sick before the call.

" '[W]hen the harassing conduct is not severe in the extreme, more than a few isolated incidents must have occurred to prove a claim based on working conditions.' " (*Cornell v. Berkeley Tennis Club*, *supra*, 18 Cal.App.5th at p. 940 ["[f]our comments over several months" did not establish pattern of routine harassment creating hostile work environment where "comments were not extreme"].) While it may have upset Schoensiegel to be told that she was being ridiculous, or to have her absence noted in an email to her colleagues, these statements were neither pervasive nor explicitly derogatory or threatening. Moreover, Robbins's statement that it was unacceptable for Schoensiegel to miss calls due to illness without letting her know ahead of time is a "necessary personnel management action[ ]" that "do[es] not come within the meaning of harassment." (*Janken v. GM Hughes Electronics*, *supra*, 46 Cal.App.4th at pp. 64–65.) Even accepting that the email may have contained an implicit message that Robbins was also irritated with Schoensiegel's absences, these statements, taken together, were neither severe nor pervasive. The FEHA is not "a civility code." (*Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1061.) Occasional comments made by a supervisor expressing frustration with an employee's disability are objectively insufficient to establish harassment. (See *id.* at pp. 1060, 1061 [summary judgment of harassment claim warranted despite emails containing "some critical comments due to the stress of being a small business owner who must accommodate a pregnant woman's right to maternity leave"].)

Finally, Schoensiegel asserts (without reference to the record) that she felt belittled by Robbins and that Robbins twisted her words. We consider whether a reasonable person with a disability subjected to the behaviors attributed to Robbins would consider them to be disparaging or derogatory toward her disabled status considering all the workplace circumstances. Schoensiegel testified that Robbins never made any disparaging remarks about her illness and that she was not aware of Robbins making such remarks to anyone else. Rather, Robbins made her "feel stupid or not intelligent" by expressing frustration that Schoensiegel did not know or remember something that Schoensiegel believed they had not previously discussed. Robbins did not ever call Schoensiegel stupid. With respect to "twisting her words," Schoensiegel testified that in her one-on-ones and recaps of those discussions, Robbins "would bring up things that we hadn't actually discussed." Schoensiegel believed that this was "to make [her] look bad," but she also agreed that she was missing metrics and doing the things that Robbins described in the emails. Notably, Schoensiegel testified that she "wasn't the only one that felt this way" about Robbins, suggesting that these behaviors were not motivated by her disability, but inherent to Robbins's management. Indeed, as discussed above, James Curcio's investigation determined that several former employees had complained about Robbins's communication style. Schoensiegel has failed to create triable issues of material fact as to whether these behaviors were motivated by Schoensiegel's disability.

### F. Abbott was entitled to judgment as a matter of law on Schoensiegel's derivative claims

Section 12940, subdivision (k) provides that it is an unlawful employment practice "[f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." In order to maintain a claim for failure to prevent discrimination, harassment, or retaliation, there must have been an act of discrimination, harassment, or retaliation. " '[T]here's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen, for not having a policy to prevent discrimination when no discrimination occurred . . . .' Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented." (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289; see also *Featherstone v. Southern California Permanente Medical Group*, *supra*, 10 Cal.App.5th at p. 1166.)

On appeal, Schoensiegel does not dispute that her failure to prevent discrimination, harassment, or retaliation claims are entirely derivative of her disability discrimination, harassment, and retaliation claims. Because Schoensiegel cannot establish the underlying causes of action, her derivative claims must also fail.

## II. Motion to Tax Costs

We review the trial court's granting costs to Abbott and Robbins under the deferential abuse of discretion standard of review. (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989; *Chaaban v. Wet Seal, Inc.* (2012) 203 Cal.App.4th 49, 52.) When we review for an abuse of discretion, a "showing on appeal is

40

wholly insufficient if it presents a state of facts, a consideration of which, for the purpose of judicial action, merely affords an opportunity for a difference of opinion.  An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.  To be entitled to relief on appeal from the result of an alleged abuse of discretion it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice." (*Brown v. Newby* (1940) 39 Cal.App.2d 615, 618.)

Under section 12965, subdivision (b), the trial court has discretion to award attorney fees and costs to a prevailing defendant in a FEHA action if "the court finds the action was frivolous, unreasonable, or groundless when brought, or the plaintiff continued to litigate after it clearly became so." (*Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 115 [concluding rule that prevailing defendant may recover attorney fees and costs only if the plaintiff's "action was objectively groundless" articulated in *Christiansburg Garment Co. v. EEOC* (1978) 434 U.S. 412, 421-422 applicable to costs].)

Schoensiegel asserts in summary fashion that the trial court's award of costs should be reversed, as it was an abuse of discretion because she had an objective basis for believing her case had merit.  Schoensiegel does not develop her claim by reference to the record or any legal argument, apart from citing *Williams v. Chino Valley Independent Fire Dist.*, *supra*, 61 Cal.4th 97.  As we have stated, the lower court's order is presumed correct (*Hernandez v. California Hospital Medical Center*, *supra*, 78 Cal.App.4th at p. 502), and failure to address an issue constitutes abandonment.  (*Wall Street Network, Ltd. v. New York Times Co.*, *supra*, 164 Cal.App.4th at p. 1177.)  We are

not bound to attempt to piece together cogent arguments from bare assertions of abuse of discretion. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.) We find that Schoensiegel has waived the argument that the trial court abused its discretion in awarding defendants their costs.

In the alternative, Schoensiegel urges us to remand on the ground that the trial court did not issue any written predicate findings before awarding costs, citing *Rosenman v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro* (2001) 91 Cal.App.4th 859 (*Rosenman*). In *Rosenman*, Division Seven of this district imposed a "nonwaivable" requirement that a trial court make written findings that a plaintiff's action was frivolous, unreasonable or groundless in all FEHA cases where attorney fees are awarded to a defendant. (*Id.* at p. 868.) The court agreed with the argument made by amici curiae that a court should "detail[ ] the findings which support any award of attorney fees to defendants in civil rights cases," (*id.* at p. 867) thus "ensuring fees are awarded only in the rare cases envisioned by the Supreme Court in *Christiansburg*, so as to avoid discouraging litigants from bringing meritorious but not airtight claims to court." (*Id.* at p. 868.) The court stated that "where the required findings are not made by the trial court, the matter must be reversed and remanded for findings, unless the appellate court determines no such findings reasonably could be made from the record." (*Ibid.*, fn. omitted.)

In its minute order, the trial court in this case "found and determined that this lawsuit was frivolously filed and pursued," but did not describe any evidentiary support for its conclusion. The trial court did not detail its findings with respect to the *Christianburg* criteria. Further, this is not a case in which a

42

finding of frivolousness could not reasonably be made from the record.

However, *Rosenman*'s nonwaivable requirement of written findings is limited to an award of attorney fees (*Rosenman*, *supra*, 91 Cal.App.4th at p. 868), and defendants in this case moved to recover only their statutory costs.  Moreover, at least one court has found that *Rosenman*'s command that reversal is automatically required unless no award could possibly be justified runs afoul of article VI, section 13 of the California Constitution and Code of Civil Procedure section 475, which provides that the Court of Appeal cannot reverse a judgment in the absence of a showing of prejudice.  (*Robert v. Stanford University* (2014) 224 Cal.App.4th 67, 72.)  In the absence of written findings, the *Robert* court found that it is appropriate to "examine the record to determine whether it nevertheless discloses that the court applied the appropriate standards.  If the record affirmatively indicates that the court applied the correct standards, the court's failure to put its findings into writing does not itself justify reversal." (*Ibid.*)  In *Robert*, the Sixth District found that the trial court's oral findings demonstrated that the court applied the correct standards and concluded that the court's failure to put its findings in writing was not prejudicial and did not itself justify reversal.  (*Ibid.*)

Without taking a position on *Rosenman*'s requirement of reversal in the absence of written findings with respect to an award of attorney fees under the FEHA, we decline to extend that rule in this case to an award of only statutory costs, and we employ the approach utilized in *Robert v. Stanford University*, *supra*, 224 Cal.App.4th 67.  Here, Schoensiegel did not provide us with a transcript of the hearing on the motion to tax costs.  It is

43

the appellant's obligation to show "reversible error by an adequate record." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574.) We cannot presume, in the absence of a record of the hearing, that the court failed to apply the appropriate criteria or make the appropriate findings, particularly given that the trial court's written conclusion that Schoensiegel's action was frivolous supports that it considered the criteria set forth in *Williams v. Chino Valley Independent Fire Dist.*, *supra*, 61 Cal.4th 97.

Furthermore, the trial court's summary judgment order contains written findings that support its conclusion in the order on costs that the action was frivolous. For example, the trial court found that there were "no facts actually presented which would or do support the plaintiff's claims of pretext at all," "that there was no failure to engage in an interactive process and no facts produced that this had occurred at all," and "that there was no harassment and not even an adequate allegation of facts in the [first amended complaint] to support a 'harassment' claim under FEHA laws and other discrimination theories." A "complete absence of evidence," as the trial court found here, supports the conclusion that an action was frivolous, unreasonable, or groundless and that an award of fees and costs under the FEHA was not an abuse of discretion. (See *Robert v. Stanford University*, *supra*, 224 Cal.App.4th at p. 73; *Villanueva v. City of Colton* (2008) 160 Cal.App.4th 1188, 1200–1201.)

We therefore conclude that remand is not warranted.

## DISPOSITION

The judgment and order of the trial court are affirmed. Abbott and Robbins are awarded their costs on appeal.

NOT TO BE PUBLISHED


MORI, J.[*]


We concur:



ROTHSCHILD, P. J.



CHANEY, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.